# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CASE NO. 2:22-CR-19-002 |
| v. | : | JUDGE JAMES L. GRAHAM |
| JONATHAN A. FROST, | : | **FILED UNDER SEAL** |
| Defendant. | : | |

## SUPPLEMENTAL SENTENCING MEMORANDUM

Defendant, Jonathan A. Frost, through undersigned counsel, respectfully submits the following Supplemental Sentencing Memorandum for the Court's consideration.

Respectfully submitted,

**/s/ Samuel H. Shamansky**
SAMUEL H. SHAMANSKY CO., L.P.A.
Ohio Supreme Court No. (0030772)
523 South Third Street
Columbus, Ohio 43215
(614) 242-3939 – Phone
(614) 242-3999 – Fax
shamanskyco@gmail.com

Counsel for Defendant

## **SUPPLEMENTAL MEMORANDUM**

This matter was originally scheduled for sentencing on November 4, 2022. In anticipation of that hearing, Defendant submitted a Sentencing Memorandum on November 1, 2022. At the time Defendant's Memorandum was prepared, he had not received a copy of the government's Sentencing Memorandum, nor notice of its filing. Given the significant time that has elapsed since the filing of the original Memorandum, as well as the need to address the government's factual assertions and legal arguments, Defendant respectfully submits that a concise Supplemental Memorandum is appropriate and will assist the Court in determining a fair and just sentence.

### **DEFENDANT'S EXEMPLARY BEHAVIOR**

At the time Defendant's Sentencing Memorandum was filed, Mr. Frost had been on pretrial supervision for a period of approximately eight months. During that time, he scrupulously followed all terms and conditions imposed by the Court and his supervising officer. He had also engaged in mental health counselling, furthered his education, maintained full-time employment, and devoted hundreds of hours to community service. As previously indicated, that behavior was a natural extension of Mr. Frost's conduct during the eighteen-month period leading up to his criminal prosecution, during which time he had voluntarily ceased all participation in illegal conduct and sought professional mental health treatment.

For the past six months, Defendant's behavior has continued to be nothing less than exemplary. He has demonstrated total compliance with pretrial services and continued to engage in positive lifestyle choices, including mental health treatment, community service, and ongoing employment. Specifically, Defendant has continued counseling and psychotherapy with Dr. Michael G. Ditsky. He has also been assessed by Dr. Meredith M. Veltri, who believes that Mr. Frost presents an exceedingly low risk of recidivism and will benefit from ongoing cognitive

behavior therapy, which is not available in prison. Dr. Ditsky concurs with that opinion. These professionals emphasize both that Defendant does not pose a danger to himself or the community and that he has completely disengaged from the radical beliefs he once held. It remains the opinion of both Drs. Ditsky and Veltri that targeted psychological intervention, rather than lengthy incarceration, will continue to best serve Defendant's mental and emotional needs and allow him to maintain the progress he has amassed over the last thirty-two months.

### THE GOVERNMENT'S SENTENCING MEMORANDUM

In its Sentencing Memorandum, the United States has presented several factual allegations and legal arguments that do not fully reflect the circumstances presented by this case or the law surrounding domestic terrorism cases. As such, Defendant respectfully requests that the Court consider the following:

**A. Acts of Terrorism and Seriousness**

The United States has asserted that anything less than a "serious term of imprisonment" in this case will "spurn respect for the law at the expense of justice." Doc. 82, PageID#398. In making this claim, the government has characterized Mr. Frost's specific offense as an "unusually serious" act of terrorism, which "overshadows any conceivable mitigating circumstances." Doc. 82, PageID#398-399. To be clear, Defendant acknowledges that all terrorism offenses are serious, regardless of whether the offender resides domestically or abroad. However, the government's argument goes even further, making the claim that federal courts have determined that "terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal" and that "[t]errorism offenses are uniquely serious." At best, these assertions misrepresent the substance of the cited cases.

3

Neither Second Circuit case cited by the government asserts that "terrorism represents a particularly grave threat" as claimed. Similarly, neither provides any case law or authority in support of that proposition. Rather, in both cases, the Second Circuit found that the Sentencing Guidelines are appropriate and reflect a "rational determination" by Congress and the Sentencing Commission that acts of terrorism represent a grave threat. *United States v. Mumuni*, 946 F.3d 97, 112-113 (2nd Cir. 2019); quoting *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003).

Though the difference between a proposition being *true* as opposed to it being *rational* might seem unimportant at first glance, the distinction between these two principles must be addressed and understood, particularly given the government's omission of the second half of the Second Circuit's analysis. In fact, the Second Circuit qualified the position espoused by the government, specifically noting both that (1) the Guidelines are advisory, and (2) "[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' *always has the discretion under § 4A1.3 to depart downward in sentencing*. Considering the serious dangers posed by all forms of terrorism, *the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases*." *Meskini*, at 92. (Emphasis added and internal citation omitted.) As such, while the Second Circuit has acknowledged that a presumptively high criminal history categorization is not irrational, it has done so while providing clear guidance that a downward departure is appropriate where application would be over-representative.

The United States has also misrepresented the Seventh Circuit's analysis in *Tounisi*. In that matter, the appellate court made no finding that "terrorism cases are uniquely serious." *United States v. Tounisi*, 900 F.3d 982 (7th Cir. 2018). Instead, the *Tounisi* court found that the trial court

4

properly weighed the sentencing factors and determined that "the offense [at issue in that case] was still gravely serious in spite of Tounisi's argument that his was not a typical 'terrorism' offense and other mitigating arguments." *Id.*, at 987. In other words, like the First Circuit in *Zapata*, the Seventh Circuit found that the trial court's comments reflected a thorough review of the factors, a reasonable finding that the seriousness factors outweighed any mitigation, and a proper exercise of its discretion. *Id.*, at 989; see also, *United States v. Zapata*, 589 F.3d 474 (1st Cir. 2009).

Defendant entirely agrees that the Court should conduct a proper review of the circumstances and balance the sentencing factors present in this matter. However, the Court should not be misled in its analysis by misrepresented case law. As such, Defendant would draw the Court's attention to one last aspect of the government's "seriousness" argument.

The government has claimed that the *Tousini* decision "not[ed] approvingly of the district court judge stating that 'a great need for general deterrence' existed because people must know that they will be punished for 'assisting terrorist organizations.'" Doc. 82, PageID#401. Though the Seventh Circuit affirmed the sentence imposed by the trial court, the opinion contains no express approval or disapproval of the judge's statement. At most, the Seventh Circuit noted that "general deterrence [played] a role in the judge's decision—he concluded that "a great need for general deterrence" existed and explained why." *Tounisi*, at 988. Thus, at most, the Seventh Circuit did not take issue with the proposition that there is a great need for general deterrence from terrorist acts.

There is one final aspect of the government's argument that must be addressed. In seeking a "serious term of imprisonment," the United States appears to draw little or no distinction between those who commit terrorist acts and those who voluntarily cease participating in those acts. Respectfully, while the government's position might rationally deter terrorism, it does nothing to

encourage individuals to desist in terrorist conduct or assist law enforcement. In fact, it encourages them to actively conceal their involvement rather than providing any cooperation.





████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**B. Comparative Cases**

In an attempt to justify its request for a lengthy term of incarceration, the government has directed the Court's attention to other cases involving acts of terrorism. However, as more fully discussed below, none of the cited cases involve the unique mitigating factors present in the instant matter. As such, while Defendant appreciates the government's desire to provide the Court with guidance as to the outcome in similarly situated cases, the truth of the matter is that there are no close approximations to the specific circumstances present in this matter.

Though the United States mistakenly relies on *Tousini* for the proposition that any and all acts of terrorism are uniquely serious, it must also be noted that the sentencing factors in that matter were markedly different from those present in the instant matter. The defendant in *Tousini* had no mental health issues, ███████████████ defied his family's attempts to intervene and halt his actions, and made no attempt to make a positive impact on the people around him. *Tousini*, 900 F.3d, at 985-986.

In *United States v. Bell,* the defendant was charged with conspiracy to provide material support to terrorists. The United States is correct that there are some similarities between these two cases: Bell was young, remorseful, his acts of terrorism were interrupted relatively early, and the Court nevertheless imposed a sentence of two hundred forty months. *United States v. Bell,* 81 F. Supp. 3d 1301, 1325 (M.D. Fla. 2015). However, unlike Mr. Frost, █████████████████ ████████████████████████ there was no evidence that his ADHD rendered him susceptible to extremist ideologies. In fact, the Court expressly found that Bell's ADHD was *not* a mitigating factor and had doubts about his remorse. *Id.* at 1318. Furthermore, the defendant in *Bell* spent

nearly two years in pretrial detention, in accordance with the government's determination that he posed present danger to the community. *Id.* at 1304. In this case, and without any objection from the government, Mr. Frost has remained under pretrial supervision for over fourteen months and utilized his time productively. Moreover, unlike *Bell,* Mr. Frost ceased his illegal conduct and had been leading a law-abiding lifestyle for approximately eighteen months prior to any criminal charges being filed.

The government also urges the Court to consider the sentences imposed in the matters of *United States v. Wright* and *United States v. Reznicek*. Again, those cases do not share the same mitigating factors that are present in this proceeding. For example, in *Wright,* four individuals conspired to obtain explosives, placed the bombs at the base of a bridge, and attempted to detonate them. *United States v. Wright*, 747 F.3d 399, 404 (6th Cir. 2014). That group would have been successful in carrying out the goal of the conspiracy but, unbeknownst to them, the explosives were inert. *Id.* In *Reznicek,* the defendant slowed construction on the Dakota Access Pipeline by blowtorching holes in the structure and committing other acts of vandalism. *United States v. Reznicek*, No. 21-2548, 2022 WL 1939865, at *1 (8th Cir. June 6, 2022). The district court found that Reznicek's crimes posed "a grave risk to others," continued over a long stretch of time, and encouraged imitation of the illegal conduct. *Id.* at *2. Neither of these opinions make any mention of the offenders' mental condition at the time of their respective offenses, remorse following the crimes, ████████████████████████████████ or their behavior while under pretrial supervision.

Mr. Frost acknowledges that attempted terrorist acts can be just as dangerous as completed acts. However, the unsuccessful conspiracy in this case is not analogous to the government's cited cases, which concern offenders who not only completed their respective acts of terrorism, but who

8

also failed to demonstrate remorse, whose behavior did not demonstrate a willingness and ability to lead a law-abiding lifestyle, and whose conduct necessitated lengthy periods of incarceration to promote respect for the law, provide deterrence, and protect the public.

To be clear, in addressing these inapposite cases, Mr. Frost does not mean to suggest that his criminal conduct was justified or should be excused. Rather, he believes it important for the Court to have full understanding of the government's cited cases both in the interest of candor, and because those matters could reasonably assist the Court in its difficult task of weighing the unique facts and circumstances presented by this case.

Defendant appreciates that the imposition of an appropriate sentence in this case is a complicated task with no easy solution. He further understands that, even considering the significant mitigating factors present in this matter, his conduct was of such a serious nature that some period of incarceration will be appropriate. He would simply ask the Court to balance the need to punish with his genuine remorse, mental health treatment, and demonstrable efforts at rehabilitation. The trial court in *Bell* recognized the importance of such efforts, explicitly noting that "if the Court was convinced that [the defendant's] repentance was sincere and permanent, he would still need to be punished, but a lesser term of imprisonment would suffice." *Bell,* at 1324. Mr. Frost's non-custodial behavior over the past thirty-two months, demonstrates his sincere remorse and provides a far more reliable metric than the questionably relevant cases upon which the government relies. Even if "heavy terms of incarceration are the general rule rather than the exception" for terrorist acts, the circumstances attendant to this matter provide cause for a deviation from the same. *Meskini*, 319 F.3d, at 92.

Mr. Frost is a young man with no criminal history. At the time of the offense, he suffered from severe, undiagnosed mental health disorders. Following the FBI search of his home, Mr.

9

Frost received therapy for his depression and avoidant personality disorder, ███████ ███████████████████ contributed hundreds of hours in community service, maintained gainful employment, and excelled in his graduate studies. Despite the government's alarmism, the imposition of a lengthy term of incarceration in this case runs afoul of the interests of justice, would actively impair Mr. Frost's mental health and efforts at rehabilitation, and would be a greater punishment than is necessary to achieve the goals of sentencing. Instead, an appropriate balancing of the sentencing factors demonstrates that Mr. Frost should be sanctioned with a short term of incarceration, followed by a lengthy period of supervision upon his release, with mental health treatment continuing throughout to ensure that his efforts at rehabilitation remain successful.

Respectfully submitted,

**/s/ Samuel H. Shamansky**
SAMUEL H. SHAMANSKY CO., L.P.A.
Ohio Supreme Court No. (0030772)
523 South Third Street
Columbus, Ohio 43215
(614) 242-3939 – Phone
(614) 242-3999 – Fax
shamanskyco@gmail.com

Counsel for Defendant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was filed with the Clerk of Court for the Southern District of Ohio, under seal, which will send notification of such filing to Assistant U.S. Attorney Jessica W. Knight on April 18, 2023.

**/s/ Samuel H. Shamansky**
SAMUEL H. SHAMANSKY